# Exhibit 1

Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-oOo-

STEPHANIE RIDGWAY, 3:15-cv-00002-HDM-WGC
Plaintiff,
vs.
SUN VALLEY GENERAL IMPROVEMENT DISTRICT,
Defendant.
======================================================

DEPOSITION OF STEPHANIE RIDGWAY
Wednesday, July 22, 2015
Reno, Nevada

Reported By: PEGGY B. HOOGS, CCR #160, RDR, CRR
CALIFORNIA CSR #5958



-oOo- APPEARANCES -oOo-

FOR THE PLAINTIFF:
LAW OFFICE OF LUKE BUSBY
By: LUKE BUSBY, ESQ.
216 East Liberty Street
Reno, Nevada 89501

FOR THE DEFENDANT:
THORNDAL, ARMSTRONG, DELK, BALKENBUSH & EISINGER
By: CHARLES BURCHAM, ESQ.
6590 South McCarran Boulevard, Suite B
Reno, Nevada 89509

ALSO PRESENT:
DAN HAMLIN



INDEX


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Burcham | 4, 114 |
| Mr. Busby | 108 |


EXHIBITS


| | | |
|---|---|---|
| 1 | Color copy of photograph | 82 |




BE IT REMEMBERED, that on Wednesday, the 22nd day of July, 2015, at 9:16 a.m., at the offices of Thorndal, Armstrong, Delk, Balkenbush & Eisinger, 6590 South McCarran Boulevard, Suite B, Reno, Nevada, before me, Peggy B. Hoogs, a Certified Court Reporter, personally appeared STEPHANIE RIDGWAY.

-oOo-

STEPHANIE RIDGWAY,
having been first duly sworn by the court reporter, was examined and testified as follows:

EXAMINATION

BY MR. BURCHAM:
Q Would you please state your full name for the record and spell your last name.
A Stephanie Georgia Ridgway, and my last name is spelled R-i-d-g-w-a-y.
Q And have you ever had your deposition taken before?
A Never.
Q All right. So I'm sure that Mr. Busby has gone through the process with you. I'm going to go through it as well, probably in a shorter version, just so that we're clear on the record. Okay?
A Okay.
Q The court reporter, Peggy, here has given you the oath to tell the truth. It's the same oath that you'll give when this case goes to trial and there's a judge and jury and we're in a formal courtroom.

Do you understand that?
A I understand.
Q And it has the same pains and penalties of perjury as if we were actually in court, so it's just very important that you give me truthful answers.
Fair enough?
A Fair enough.
Q You need to remember that the court reporter is taking everything down verbatim, and by doing that you need to -- you need to give me answers that are words. Grunts and uh-huhs and huh-uhs don't work very well.
So if I ask you a question, "Did you have a nice drive over here?" and you go, "Uh-huh," I will say, "Was that a yes?" And I do that not to embarrass you but, rather, just so we have a clear record. Okay?
A Okay.
Q Another important thing for us to do is to talk one at a time. The court reporter has a real difficult time taking both people talking at the same time. So try to wait until I've finished asking a question before you start your response. Okay?
A Okay.
Q And by the same token, if I ever cut you off, if you have not finished your answer, you've got to let me know. Okay?



A Okay.
Q What I want to make sure is you have a full and complete opportunity to give me accurate answers today. All right?
A All right.
Q For instance, sometimes people, in normal conversations or in asking questions, might pause, so I might pause during one of my questions. You might think I've finished asking the question and you'll start to jump in. You've got to wait until I'm done. Okay?
A Okay.
Q And if I ever cut you off, you just have to let me know.
A Okay.
Q Are you under any medication today that might affect your ability to either understand my questions or give me proper, accurate, and complete responses?
A No.
Q Are you under any medication at all today?
A Huh-uh.
Q I've seen some medical records that indicate that you, at the time of this incident and even before, had some chronic pain issues, rheumatoid arthritis and issues with your knees, and you were taking Norco.
A Yes.



Q So you're not taking any Norco?
A Not today, no.
Q Was that because you wanted to make sure your head was clear?
A They -- yeah. I mean, I wasn't in that much pain. I take them when I need them, you know.
Q Did you have some injury in your past where you hurt your knee?
A No. No.
Q Just kind of over time?
A I have actually had this pain ever since I was a child, and they said it was Osgood-Schlatter, something like that.
Q We won't -- do you know how to spell that?
A I don't know how to spell that.
Q That's all right.
Rheumatoid arthritis, have you ever been actually diagnosed with rheumatoid arthritis?
A Yes.
Q And your date of birth is what?
A 9/22 of '86.
Q So you're 28, going on 29?
A Yeah.
Q And about when were you diagnosed with the rheumatoid?



A I want to say "diagnosed" diagnosed was 2012.
Q And after being diagnosed with that, did you have, like, a physician that you'd normally go see for it?
A There's, like, a group of physician.
Q Are they with the Contra Costa Medical Group?
A Yeah.
Q Was there anybody in particular, though, that was treating you for the rheumatoid?
A You never know who you're going to see there.
Q Just a couple other little warnings and stuff before we get into the meat of this.
One has to do with after this is all done, after the deposition is completed. The court reporter prepares a transcript of everything that happened in the room today. It will have all my questions, your answers, anything that Mr. Busby has to say, and you'll be able to review that. Okay?
A Okay.
Q And you can on occasion make changes to your testimony. When it comes out in the written form, you can change things. Sometimes there's typographical errors, misspellings, things like that. If they are minor, it's no big deal. If it's a material change, if it's something that goes to the real substance of the

case on either what happened or your injury or anything like that, then myself or any other lawyer can comment on that at the time of trial and it might affect your credibility. Okay?
A Okay.
Q So just be aware of that.
At some time also during the proceeding today I might ask you to give me an estimate, an estimate of time, estimate of distances, things like that.
Lawyers have come up with a bunch of examples of what an estimate is versus a guess because we really don't want guesses on things. Okay?
A Okay.
Q I'm going to give you a couple of silly examples just so you're aware of how lawyers think on these things.
If I asked you, how long is this conference room table here, you don't have a yardstick, you don't have a tape measure, but you could maybe say, maybe 12 feet long, 10 feet long, something like that. That would be an estimate. It would be based upon your own perception. Okay?
A Okay.
Q We have a conference room table in the room next to us that you've never been in. If I ask you how



long that table is, it would be a guess.
A Okay.
Q See the difference?
A I see the difference.
Q Another one. I just like giving this one.
If I ask you how much money you brought with you today, you might not know exactly, but you could say maybe 20 bucks. That would be an estimate. If I asked you how much money I had in my wallet, you wouldn't know, unless you see my wedding ring and know I'm married, so I probably don't have any money in it because all that money goes elsewhere. Okay? That's a joke. See, that's the difference between a guess and an estimate. All right?
A Okay.
Q With that, what is your current residential address?
A 1951 Peach Place, Concord, California.
Q And what's the zip code?
A 8 -- 94518.
Q How long have you lived there?
A About two years.
Q And so you were living there at the time of this incident?
A Yes.



Q Who do you currently live there with?
A My father and my stepmother.
Q And your father is James?
A Yes.
Q Does he go by Jim?
A Yes.
Q And same last name?
A Yes.
Q And what's your stepmom's name?
A Tova, T-o-v-a, Ridgway.
Q So just three of you live there?
A There's like a separate place in the back my brother lives, but --
Q What's your brother's name?
A Dylan, D-y-l-a-n.
Q Same last name?
A Porter.
Q Now, I understand from the records you have at least one child.
A I have two children.
Q Two kids. And what are their names and ages?
A My first child, her name is Elizabeth Anais Ridgway. My second -- she is six years old. My second child is Solei, S-o-l-e-i, Ridgway, and she is three years old.



Q And where do they live?
A They live with me at the same address.
Q Okay. So I get the living situation right, at 1951 Peachtree --
A Peach Place.
Q Peach Place, sorry. I wrote down "Place" and I said, "tree." Sorry.
In any event, at that residence it's your dad, your stepmom, Dylan lives out back, Elizabeth, and Solei?
A Uh-huh.
Q "Yes"? That was a "yes"?
A Sorry. Yes.
Q That's an example of an uh-huh. That's all I do or say, "Is that a 'yes'?"
A Bad habit.
Q It's a human habit. Don't worry about it.
So there's -- one, two, three, four, five -- six people total living in the residence?
A Yes.
Q Prior to living at Peach Place in Concord, where did you live?
A I lived on Shannon Court. Shannon Court, I think it was.
Q In what town?

A It was in Sparks, Nevada.
Q Let's back up. Just a little bit of history.
Where were you born?
A Richmond, California.
Q And when you went to elementary school, where did you go?
A I went to so many different elementary schools. Highland Elementary.
Q Let me ask you this: The elementary schools you went to, were they all over in California?
A Uh-huh, yes.
Q And after elementary school you went on to junior high and then high school?
A Yes.
Q Junior high, was that over in California?
A Yes.
Q And high school, how about that?
A Here.
Q All right. So at some point in time you and your family or some members of the family moved from California to Nevada?
A Yeah.
Q And when did that happen?
A '99.
Q So when you were about 13 or so?



A Yeah.
Q When you moved over here to Nevada, was that with your dad?
A With my mother.
Q With your mom. What's your mom's name?
A Stella.
Q And last name?
A Villanueva, V-i-l-l-a-n-u-e-v-a.
Q All right. So you and your mom -- any siblings move over here?
A Yes.
Q And what siblings?
A Angel -- that's my brother -- and Sophia.
Q Sister?
A My sister.
Q How old is Dylan?
A Dylan, he is 24.
Q So you moved over to Nevada in 1999 and went to where, Sparks?
A Sparks High.
Q What year did you graduate from Sparks High?
A I ended up getting my GED.
Q Okay. What was the last year at Sparks High that you attended?
A 2003.



Q Sophomore year? Junior year?
A My junior.
Q What year did you get your GED?
A 2004.
Q When you left high school, did you go out and get yourself a job?
A I was already working.
Q Where were you working?
A Subway.
Q And so in about 2004 you went and got your GED.
After that have you gone on to any community college?
A Yes.
Q And what community college?
A It's called NCA.
Q NCA, do you know what that stands for?
A Nevada Career Academy.
Q And where is that located? In Nevada perhaps?
A Yes. It was off Greg in Sparks.
Q What years did you attend, calendar years did you attend Nevada Career Academy?
A 2005-2006.
Q Was that full-time?



A Yes.
Q And were you working as well?
A At that time I was no longer working.
Q Were you living still with your mom?
A Yes.
Q And did you get some sort of degree or certificate or anything?
A Yes.
Q What was it?
A Medical assisting.
Q Medical assistant?
A Uh-huh.
Q "Yes"?
A Yes.
Q And a medical assistant would train you to do what?
A Nursing, like clinical nursing.
Q But it's not getting, like, an RN degree or an LPN?
A It's not RN, no.
Q And you got that in 2006 sometime?
A Yes.
Q And did you go into the medical field?
A Yes.
Q And what did you -- where did you work?

A I worked at Reno -- actually, my first one was Eastern Sierra Medical Group, I believe.
Q And what did you do for Eastern -- was that located here in the Reno-Sparks area?
A Reno, yes.
Q And what did you do for them?
A I was a medical assistant.
Q What were your job duties?
A I was rooming patients, taking their vitals, their chief complaints, and drawing blood, giving injections, doing EKGs, urinalysis.
Q So this was a family practice clinic?
A It was a group of physicians, so, I mean, I think it was a family practice.
Q So you'd be the person that would show a patient into the room, you'd do the vitals, maybe take a bit of history?
A Yes.
Q Prep them to see the doctor?
A Exactly. And then take the doctor's orders from there.
Q How long did you have that job?
A About eight months.
Q Then where did you go?
A Then where did I go?



Q Yes.
A Reno Diagnostic Center.
Q And what did you do for Reno Diagnostic?
A I was -- it's not called a medical assistant, but I did the same duties as a medical assistant. They just called it something else. I'm not exactly sure of the name anymore.
Q And about how long did you do that?
A I want to say about the same amount of time.
Q After that -- we're just chipping through this. It's kind of like I'm trying to paint the picture of a résumé for you. Okay?
A Okay.
Q So after Reno Diagnostic what did you do?
A I worked at Tequila Rock.
Q What's that?
A A bar.
Q Where is that located?
A It's no longer, but it was located on South Virginia right before the Peppermill.
Q And what did you do for them?
A I would charge the cover to get in because it was, like, you know, a bar/nightclub.
Q And so you got out of the health care field and went into this other job?



A Yes.
Q And then how long did you work for Tequila Rock?
A For about a year or so.
Q Then what did you do?
A Then I got pregnant, and then I've been pretty much a mother since then.
Q So after getting out of Nevada Career Academy in 2006, you haven't gone to any further education?
A No.
Q So at some point in time you moved back to California from Nevada?
A Yes. About two years ago.
Q And what were the circumstances of that?
A It was -- me and my baby's father were having problems, so I went back with my father.
Q And is the father of Elizabeth the same as the father of Solei?
A Yes.
Q And what's his name?
A Victor Moreno.
Q M-o-r-e-n-o?
A Yes.
Q And do you know where Victor currently resides?



A No.
Q Do you have any contact with him at all?
A No.
Q While you were living here in Nevada, were you and Victor living together somewhere?
A Yeah.
Q Was that with your mom or --
A Shannon.
Q With who?
A Shannon Way. It was Shannon Court, I think, before I moved to California.
Q So when you and Victor had problems, you moved back -- this was a couple years ago -- to live with your dad, James or Jim, and his wife?
A Yes.
Q And that's where you've resided ever since?
A Yeah.
Q All right. I've gotten some medical records concerning you, and I was talking to your lawyer that we don't have all of them yet, and so I'm going to be shooting in the dark on a bit of this, but just as we get into it, I'm looking at a document from Renown Medical Center, and it is Bates-stamped 000227, and it's the emergency room note of -- or the intake sheet for 6/20/2014. I'll just show you it. It says "Renown" and

it's got that date, 6/20.
It's my understanding 6/20/2014 is the date of the incident in question; right?
A Yes.
Q You don't have to read the whole thing.
On this it says "Employment Status: Not employed."
A No, I was not working then.
Q So on the day of the incident you weren't working? As of the day of the incident --
A As of the day of the incident --
Q -- you were not employed?
A No. I think I have -- I had been doing my on call kind of. They call me when they needed me.
Q And two days later you went back to Renown. The date is 6/22.
Once again, you agree with me it says "Not Employed"; correct?
A Yes.
Q Correct?
A Yes.
Q That would be from information that you had provided to Renown; they asked you?
A Uh-huh.
Q Correct?



A Yes.
Q And you responded truthfully; correct?
A Yes.
Q And during the course of the treatment that you had for your injury, on various occasions doctors, nurses, other health care people would ask you, "How are you feeling? What happened?" Just general health questions; right?
A Yes.
Q And you were truthful and honest in your responses; right?
A Yes.
Q And you would expect that -- because you've been in the health care field, and when you would ask those kinds of questions to people, you'd want to make sure they were truthful and honest, too; right?
A Yes.
Q Now, it's my understanding that the injury that we're going to be discussing here today is to your right ankle; correct?
A Yes.
Q And had you ever injured your right ankle before this incident?
A Never.
Q Had you ever broken a bone of any type before



this incident?
A Never.
Q And that would be everything from fingers to toes to your back?
A Never broken a bone.
Q Have you ever been in an automobile accident that resulted in a physical injury to you?
A No.
Q Have you ever been involved, even up to the current date, in a trip-and-fall or slip-and-fall that resulted in injury to you?
A No.
Q When you were in high school, did you engage in any sports?
A I was in swimming for a lot of my life, but in high school I stopped.
Q What I want to know is, when you were in high school over at Sparks High School, were you a member of the soccer team or anything like that?
A No.
Q I'm just focusing now on your injury. It was to your right ankle, and the first treatment that you received was with REMSA.
That's the ambulance folks; correct?
A Yes.



Q Do you know how REMSA was called to the scene?
A I don't know who called them, but I do know it was somebody in -- one of the employees there.
Q One of the employees at the swimming pool called REMSA?
A Yes.
Q Was that because you said, "Call REMSA" or "I need help" or something like that, or did they do it on their own, or do you know one way or the other?
A I don't know.
Q Prior to REMSA getting there, did any employees of the pool provide you with any first aid?
A No.
Q You did talk to them, though? I mean, people from the pool were there?
A Yes.
Q We'll get into that in a little bit.
When REMSA got there, can you tell me approximately how long it was -- and this is that estimate-type thing -- approximately how long it was after your incident that they arrived?
A Twenty minutes.
Q And sometimes when somebody is injured and they call 911 or 911 is called, a first responder, which

might be a fireman, fire truck, might show up.
Did that happen?
A I think so. I mean, honestly, this is going to sound probably crazy, but I really feel like I can't remember some things that day. It was like my adrenaline and I was freaking out and my leg was -- I couldn't really pay attention to what was going on around me. I was just trying to focus on --
Q I failed to mention this. I don't want you guessing -- I did mention that -- but if you remember something, tell me. If you just flat don't remember, tell me. If you don't know because you just have no basis of knowing something, how old am I, tell me, "I don't know." I don't want you guessing on anything.
But that having been said, if you have a dim recollection, if you have a vague recollection, let me know because I need to know -- I need to pull out whatever is in your mind so that I understand where you're coming from. Okay?
A Okay.
Q Don't guess.
So do you have any recollection of somebody, like a fireman, fire department, showing up before the REMSA ambulance?
A No, I don't.



Q When the REMSA folks got there, you do have a recollection of at least them coming there?
A Yeah. They put me on, like, a gurney and they took me in the ambulance.
Q And they took your vital signs?
A Yes.
Q And they probably asked you some questions, what happened, that sort of thing?
A Yes.
Q And by the way, we'll get into this in a few minutes, but do you recall the time of day that the incident happened?
A I want to say about 4:00.
Q And how long had you been at the pool prior to the incident happening?
A Maybe like an hour and a half.
Q And you were not alone; you were with a group of people?
A Yeah.
Q And I just need you to list for me the group of people that you were with.
A My little sister, Sophia Roman.
Q Hang on a second. I have to write them down here.
And Sophia is how old?



A Right now she's 17.
Q And this was about a year ago, so she was about 16?
A Yes.
Q And what's Sophia's last name?
A Roman.
Q Who else?
A Victor Moreno.
Q And who else?
A Cindy -- Cynthia Sanchez.
Q And who else?
A Victor Moreno's son, Victor Moreno, Jr.
Q And who else? Before I get to who else, Victor Moreno, Jr. was how old?
A Ten.
Q When you and Victor were together, was Victor employed?
A Yes.
Q Back a year ago or so when this incident happened, do you know where he was employed?
A Seven Seas Manufacturing.
Q Seven Seas?
A Uh-huh.
Q And where is Seven Seas Manufacturing?
A 3419 Corsair.



Q Corsair?
A Street, I think, Reno, Nevada.
Q What did he do there?
A He's a supervisor of the warehouse.
Q Warehouse supervisor?
A Uh-huh. Yes.
Q That's okay.
So neither of your kids were there?
A Both of my kids were there.
Q So we have your sister, Victor, Cynthia, Victor Jr., your two kids.
Anybody else?
A Cindy's son -- Cynthia's son Andru Sanchez. That's A-n-d-r-u.
Q And how old is Cynthia's son Andru?
A I want to say he was about four at the time.
Q Anyone else in your group?
A No.
Q So it sounds like there were about eight or so people in the group?
A Yeah.
Q All right. When was the last time you talked to Cynthia?
A Couple months ago.
Q And Mr. Busby and I chatted about this the

other day. We wanted to get her in here for her deposition. We've been trying to get a subpoena to her, and the process server, who's the one who hands the papers to the witness, has indicated that there's a dog and he's having very difficult problems getting in touch --
A The dog is like this big (indicating).
Q It's some yappy dog. I don't know. I'm just reporting.
You haven't talked to her at all about this?
A No, I have not.
Q Do you know who Cynthia lives with?
A Herself.
Q Herself and her son?
A Yes.
Q And do you know her address off the top of your head?
A No. I really haven't talked to her. I've been trying to get ahold of her, too.
Q Well, we'll continue to work on it.
So when REMSA got there, to the scene, there was your group, and there was at least somebody from the pool; right?
A Yes.
Q Do you need to take a break to get any coffee



or anything? You're yawning. I want to make sure --
A No, that's okay.
Q Did the ambulance people give you any pain medication at the scene?
A Yeah. Yes.
Q Do you remember what they gave you?
A No.
Q But it was for pain?
A Yes.
Q And did it knock the pain down?
A Not too well.
Q Now, in the medical records that I've seen, you were being -- and we kind of went over this a little bit at the beginning -- but you were being treated for chronic pain issues.
A Yes.
Q And you were taking daily Norco?
A Yes.
Q And was it four 10-milligram a day?
A Yes.
Q Had you taken any of the Norco the day of this incident?
A I think maybe -- maybe two.
Q Is it a situation where you take it every -- take one every four hours?



A Yes. You know, actually, remembering that day, I was not in that much pain. I was actually feeling pretty good. I probably had only taken one, maybe not even any. When I feel okay I won't take them.
Q Did you tell the folks, the ambulance folks, that you had taken any Norco that day?
A I don't remember.
Q Other than doing an assessment, vitals, giving you some pain medication, do you remember anything else that the ambulance folks did?
A No.
Q Did they put you on a gurney?
A Yes.
Q Did they splint your leg in any way?
A I really don't remember.
Q So you don't remember?
A No.
Q But you ended up getting loaded in an ambulance and taken to the hospital?
A Yes.
Q Did anybody in your group go with you in the ambulance?
A No.
Q Did they follow you in private vehicles?
A Victor did.



Q Did the rest of the group just stay at the pool?
A No. They all went home.
Q And so Victor followed the ambulance to the hospital?
A Yes.
Q Now, there's a bunch of different hospitals in Reno -- not a bunch, but there's several -- and you ended up going to Renown.
Was there a reason Renown was picked that you're aware of?
A No. That's just where they took me.
Q When you got to the hospital what happened?
A When I seen the doctor? They ordered X-rays, and that's when they put my leg in a -- what do you call that -- splint.
Q Splint, okay.
So let me just trace this through.
The ambulance arrived at the hospital. Did it go to the ER?
A Yes.
Q And then they brought you in and you were placed in one of the ER rooms; right?
A Yes.
Q And somebody came in and took your vitals and

did all that; right?
A Yes.
Q And then eventually you saw a doctor?
A Yes.
Q And that's when they splinted your leg?
A They did X-rays, and then they splinted it.
Q X-rays and splinted it.
And did they tell you what they found in the X-rays?
A Yes.
Q What did they say?
A That my ankle was broken.
Q When they said that did they give you any directions of what kind of follow-up you needed to do?
A Yes.
Q What did they tell you?
A That I needed to stay off of it and elevate it and take medicine and I needed to see another -- what do you call that -- a doctor that did surgery because I probably needed surgery.
Q So somebody at the ER, some doctor at the ER said you're going to need to follow up with somebody?
A Yes.
Q And there might be surgery in your future?
A Yes.



Q Now, when that came down you were still living in California; right?
A I was supposed to be moving out here.
Q Okay. Now, if this incident happened on 6/20/2014, how long had you been in Nevada? Strike that.
Were you just visiting, though, at the time?
A At the time I was visiting. It was summertime, and I was -- pretty much planned to stay the whole summer and then possibly go back and get my stuff and move back with my baby's father.
Q So, what, you were trying to reconcile?
A Yes.
Q And how long had you been up here in Nevada?
A I was up here for not that long. That happened right when I got here from California.
Q It had been a week or two, a day or two?
A That was probably the second day I got here.
Q And where were you staying?
A With Victor.
Q And what was Victor's address?
A I don't remember. It was off of Merchant.
Q Off of Merchant?
A Yeah.
Q So Merchant is the main drag?
A It's the street name.



Q Right. But the address isn't on Merchant?
A The address is.
Q It is on Merchant?
A Yeah.
Q Got it.
Is that in Reno, Sparks, Stead?
A Sparks.
Q And Sparks has grown over the years. What's the nearest big street, like Prater, Vista?
A Oddie and Sullivan.
Q Okay. Apartment or --
A Apartment.
Q After the incident on the 20th of June, did you return immediately back to California?
A No. I was having a problem getting to California.
Q What kind of problem were you having getting to California?
A A financial problem.
Q You didn't have money to get back there?
A It was money, and I couldn't drive because my ankle was messed up, and I didn't have anybody to drive me, and I couldn't pay anybody to come and pick me up.
Q So the records that we have indicate that you did go back to Renown a couple days later.



A Yes.
Q Why did you go back to Renown a couple days later?
A Because it kept unraveling.
Q What kept --
A They wrapped it up, and it just kept unraveling the wrapping.
Q So the splint included what's like an Ace bandage to wrap up?
A Yes.
Q And that's what kept unraveling?
A Yes. And I remember the pain was just excruciating.
Q And they gave you pain medication at the hospital?
A Yes. But it did not seem to be working. And I mean, you can honestly see, too, I've had a problem for a long time. I've had to take pain medication for a lot of my life and you grow a tolerance toward the stuff, you know.
Q I saw some medical records where you described some of that to the people at the hospital.
A Yes.
Q What kind of pain medication did they give you at the hospital on 6/20, the day of, that you

remember?
A I don't remember.
Q They gave you something?
A They gave me something.
Q So you had the pain medication that they gave you at the hospital plus the Norco?
A I didn't have -- I came with a certain amount. I didn't see the doctor, I think, for a while. I didn't have a lot when I came with me, when I came down here.
Q When you were living here in Nevada prior to any of this happening and you were moving back to California and such, did you have a primary care physician?
A Yeah.
Q Do you remember who it was?
A I don't remember his name.
Q Was he in a group?
A A what?
Q A group.
A Yeah.
Q Do you remember the name of the group?
A No.
Q Do you remember where the office was located?
A South -- South Reno.



Q On South Virginia Street?
A Yes. It was a group. Yes, I remember.
Q So whatever pain medication that was given to you at Renown on 6/20, you didn't find it very effective?
A No. Not towards that pain, no.
Q Did you keep your leg elevated?
A Yes. The most I could, because I have two children to take care of, and I can't let them go without food. I mean, I had to feed them, I had to do things. So, I mean, besides the essentials, I tried to do the best as I could to keep it elevated.
Q And you were with Victor at the time?
A Yes.
Q And Victor was unable to take you over to California?
A Victor doesn't have a license.
Q Doesn't have a driver's license?
A Doesn't have a driver's license.
Q When you went back in on 6/22, two days after the incident, when you went back to Renown, how did you get over there?
A My mom. Actually, I think that might have been Cynthia. I know she took me one of the times.
Q I want to make sure we're clear. I've got records that indicate, from Renown, you were there twice,



6/20, the day of, and you were transported there in the ambulance on 6/22.
A Yes.
Q Did you go there on any other occasion following this incident?
A Not there.
Q Did you go anywhere else in Nevada following the incident regarding your ankle?
A I think I did.
Q Do you remember where?
A Saint Mary's.
Did you get my bills from Saint Mary's?
MR. BUSBY: I'm not allowed to answer that question for you. Just answer the questions to the best of your recollection.
THE WITNESS: Okay.
BY MR. BURCHAM:
Q We don't have anything from Saint Mary's, Luke and I don't. I don't know whether Luke does. He hasn't given me anything.
MR. BUSBY: If I had anything, you got it.
BY MR. BURCHAM:
Q So you think you may have gone to Saint Mary's?
A I did not go to Saint Mary's. No, I didn't.



Q Did that little discussion we have kind of jog your memory a little bit?
A I remember my mom being there one time, and I remember Cindy giving me a ride one time. I don't know if my mom was with us that time. I don't remember who drove, but I remember Cindy gave me a ride to the hospital.
Q To Saint Mary's?
A Yes. No, no, no. To --
Q Renown?
A -- Renown.
Q So just to be clear so we don't go and turn things upside down and look underneath mattresses to try to find other medical records, is it your recollection that you went to Renown twice?
A Yes.
Q And do you have any recollection of going to any other doctor, health care provider, anything else in Nevada, for your right ankle injury?
A Not to my recollection.
Q But if you have a dim recollection, what we can do and what Mr. Busby can do or I can do is we can send a request over to Saint Mary's and see if they have anything, because who knows --
A I never went there.

MR. BUSBY: If we could go off the record.
(A discussion was held off the record.)
MR. BURCHAM: It's 10 o'clock. I'd like --
THE WITNESS: There's another one. Isn't there another hospital?
BY MR. BURCHAM:
Q Okay. Back on the record.
There is another hospital out in Sparks called Northern --
A You know, I think I did go there. I think I did go there one time because I couldn't -- they couldn't get the bandage right. The bandage kept --
Q Kept falling off?
A Yeah.
Q That's called, I think, Northern Nevada Medical Center.
Luke, can you send something over and see if we can get those?
MR. BUSBY: For the record, I'd be glad to send a medical records request, and as soon as I get a response, I'll disburse them.
MR. BURCHAM: Okay. We'll dig that out. And we got a thing, too, we have an authorization, so we'll see if we can sort that out.
I like to go about an hour and take a break.



We've been going about 55 minutes, so what we're going to do is just take a quick 5-minute break to get up and stretch. Okay?
THE WITNESS: Okay.
(A recess was taken.)
BY MR. BURCHAM:
Q So we've got two visits to Renown. It looks like we've got a visit to Northern Nevada Medical Center.
Now, at some point in time after those visits you did find your way back to California?
A Yes.
Q And how did you get back there?
A Oh, man. I remember my -- my mom, she drove me back.
Q Did you have a car?
A Yes.
Q And she drove your car?
A Yes. And she came back on the Greyhound.
Q And so you went back to California and went back to your dad's place?
A Yes.
Q And you had your two kids with you?
A Yes.
Q When did you and Victor break up, so to speak? When I say -- I know you guys were separated, and



I know also that Victor was with you at the time of this incident, so what I'm getting at is, after June of 2014 when did the two of you break up?
A August.
Q Now, after going back to California in late June 2014, did you ever move back to the Reno-Sparks area?
A No.
Q So after your mom drove you and your kids over and dropped you off at your dad's place in California, that was the last time that you lived -- excuse me.
Well, you didn't move back to Nevada to live; correct?
A No, not to live.
Q Did you come back to visit?
A Yes.
Q And when you came back to visit any time between late June 2014 and now, about how many times did you come back?
A Christmastime, Thanksgiving, maybe one other time. Three times.
Q Who were you visiting?
A My mother and sister.
Q And I might have asked you this and I



apologize.
What's your mom's address over here?
A Does it have my little sister's address on anything? Because I don't know. I know it's C Street.
Q It's something C Street in Sparks?
A 18 something C Street.
Q So you came back a few times to visit after this incident?
A Yes.
Q Now, do you remember what day of the month, what the date was of the month of June of 2014 when you got back to your dad's place?
A No.
Q All right. Do you remember the date of your first visit to a doctor over there in California, for your ankle?
A July. I know it was in July.
Q Do you know whether it was before or after July 4th with the fireworks and all that kind of stuff?
A After.
Q That was a little bit of memory testing because the records we have indicate you went to an outfit called John Muir something or other?
A Yes.
Q Is it John Muir Hospital or --

A John Muir Medical Center.
Q So John Muir Medical Center is a hospital?
A Uh-huh.
Q "Yes"?
A Yes.
Q And the records that we have indicate that you went there on July 1st.
A Okay. Yes.
Q And when you went to John Muir Hospital, had you -- well, had you ever been to John Muir Hospital before?
A Yes.
Q And was John Muir Hospital -- well, when you had kids where were they born? What hospital were they born in?
A Renown.
Q Both?
A Yes.
Q So what kind of medical treatment had you received at John Muir Hospital before?
A Oh, I think it was my gallbladder. I had to have my gallbladder removed.
Q In about what year did that happen?
A 2013.
Q Other than the gallbladder removal, had you



ever been to John Muir Hospital for any other thing?
A Not that I can remember.
Q And how was it that it came about that you picked out John Muir Hospital to go for your ankle?
A Because my dad told me it's a great hospital.
Q Now, we have a lien in the file, and a lien -- I don't remember the exact name that it's from, but it's from the State of California for amounts that they have paid towards your medical bills.
Did you have health insurance at the time of this incident?
A Yes.
Q Through the State?
A Yes.
Q Is that one of those programs that's for, like, single moms?
A Yes.
Q And do you still have that?
A Yes.
Q And the lien amount we have is around $2300. I don't know if you've ever seen it. Maybe they send you documents on it.
Does that sound about right?
A Yes.
Q All right. Do you remember the name of the



program?
A That I'm on?
Q Yes.
A Welfare.
Q But it's not politically correct to call it "welfare." Is it --
A CalWORKs.
Q CalWORKs?
A Yes.
Q But that's --
A That's part of the Medi-Cal when you sign up for health through the State, yeah.
Q Do you get, like, a little insurance card and everything?
A Yes.
Q All right. So you went to the John Muir Hospital, and the date that we have from the records is July 1, 2014.
Can you tell me approximately how many days you had been in California at your dad's place before going to John Muir?
A Just approximately a few days.
Q And at that point in time were you still having problems with the thing on your leg and it coming unraveled and all that?



A My main problem, too, was my toes kept going numb.
Q Now, there is some mention of that in the records from Renown on 6/22, and the records also indicate that they did neurological tests and they didn't find any real serious problems going on.
Does that sound about right?
A Yes.
Q So you went on 7/1 to John Muir.
Was that, like, going to the ER or had you made an appointment? How did that work?
A To John Muir?
Q Yes.
A That's an emergency room.
Q And what did they do for you?
A They took it off and did it -- they rewrapped it and put a new splint on.
Q And did that splint work better than the first splint?
A Yes.
Q Now, I think we've determined you went to a medical facility three times in Nevada: 6/20, day of; and the splint was put on 6/22 at Renown; and then at some other time to Northern Nevada.
A Uh-huh.

Q Did that they ever change the splint out?
A Yes.
Q So it wasn't the original splint?
A No.
Q And the second splint they put on, you were still having problems with it?
A Yes.
Q And then you went to the John Muir Hospital, and they took off the second splint and put on another one?
A Yes.
Q Was the splint the same type of splint that would be some sort of a stiff device with a -- or object with a wrap around it?
A The second time -- the splint goes around your ankle like this, like a U (indicating), and the second time that they put it on, they put one with the support also to the back of my leg, and it came underneath my foot, and when they did that it stayed on and never unraveled.
Q Is that what they did at John Muir?
A Yes.
Q Got it. And what else did they do for you at John Muir other than changing out the splint?
A Nothing.



Q At some point in time you had some additional follow-up treatment with Contra Costa Health?
A Yes.
Q Now, Contra Costa Health was a place that you had been to prior?
A Yes.
Q That's your main treatment facility?
A Correct.
Q And there's some records from Contra Costa Health that talk about various issues that you had, including chronic pain, including some sort of anxiety disorder.
A Yes.
Q Were you ever prescribed antianxiety medication, such as Valium or Xanax, anything like that?
A No. Maybe, like, ten years ago.
Q There's a reference to Wellbutrin.
A Yeah. Yes. I have depression.
Q How long have you had depression?
A For about three years.
Q There's a note -- and it's on page 14 of the medical records -- where it's talking about the Norco and this and that, and it says "with sciatic referral."
"Sciatic" would mean back pain?
A Yes.



Q And it said "Taking 4 Norco per day."
A Uh-huh.
Q "Yes"?
A Yes.
Q "Helps her function while caring for children."
And Gabapentin and Elavil?
A Yes. They're medicine.
Q You've taken those in the past?
A Yes, I have.
Q And the condition requiring narcotics was low back pain?
A Lower back pain. It was my knees, yeah.
Q And drug regimen was 120 Norco per month?
A Yes.
Q And so I just want a list of your various medical problems that you had as of the day of this injury. Okay?
So we know you had the rheumatoid issue and the knee issue and the back issue and the depression issue, and it says "Chronic pain." Maybe that's just -- I mean, chronic pain is one of those big kind of overarching words that doctors use.
Anything else that you remember? You had the gallbladder issue in 2013. Any other ongoing medical



problems?
A No.
Q There's a reference to discussion with Dr. Lee, psychiatry.
Did you ever see a Dr. Lee who was a psychiatrist?
A No.
Q But you did take some Wellbutrin?
A I was taking Wellbutrin.
Q Any other depression-type medications, such as Paxil or any of those types, that you remember?
A No.
Q As of the date of the incident, we know that you had an ongoing prescription for Norco; correct?
A Yes.
Q And you had an ongoing prescription for Wellbutrin?
A Yes.
Q Any other ongoing -- how about diabetes?
A Yes. Glipizide.
Q And so it's a Type II diabetes?
A Yes.
Q And it currently is handled through oral medication?
A Yes.

Q You don't have to take the shots; is that correct?
A I'm supposed to, but I haven't been.
Q Have you ever?
A Yes.
Q You have taken insulin shots?
A Yes.
Q When were you diagnosed with Type 2 diabetes?
A Second pregnancy, 2008.
Q Now I'm a little confused.
Second pregnancy, 2008. Looking at the medical records --
A 2011. So sorry.
Q That's okay. All right.
So any other ongoing medications that you were under as of the date of this incident?
A No.
Q So you eventually found your way into the Contra Costa medical facility; right?
A Yes.
Q And do you remember about when the first visit there occurred?
A In July.
Q We know July 1st you went to John Muir. Can you give me an estimate of how long after --



A The 15th, let's just say. The 15th.
Q Once again, it's a little bit of a test to see how you're doing.
The date was the 8th, according to the medical records.
A It was? Okay.
Q When you went in on the 8th, was that into an emergency room setting or had you made an appointment?
A I made an appointment.
Q With the orthopedic department?
A Orthopedic surgeon.
Q Now, we've got the medical records -- I've reviewed them -- of that visit. One of the things that they did -- and I'm just curious, maybe you can enlighten me -- is they ran a drug screen on you for various things, including opiates, which would be, you know, Norco and things like that, and then a variety of other things.
Did they tell you why they were doing that?
A Oh, that is -- that actually was -- I went to see my primary care physician first, and she is the one I needed to see to get the referral to the orthopedic surgeon, and when I see my primary care physician, if they prescribe you a prescription of pain medication, they need to make sure that you have it in your system



and they're not prescribing it to you for you to go sell it or something. And if you're on any other -- if you're on anything else, then they'll completely turn off your pain medicine.
Q All right. So when you went in on 7/8, they did a drug screen on you?
A Yes.
Q And it came back positive for opiates?
A Yes.
Q Because you were taking pain medication?
A Yes.
Q The Norco?
A Yes.
Q And we know on 6/20 at Renown you had gotten some pain medication; right?
A Yeah.
Q And we know that on 6/22 you had gotten some pain medication at Renown?
A Yeah.
Q At Northern Nevada had they given you some?
A I don't think so.
Q How about John Muir when you got there on 7/1?
A I don't know.
Q Do you remember having any discussion with



people at John Muir regarding the type of pain medication?
A I remember asking if they could change my pain medicine because the one they were giving me wasn't working.
Q Did they?
A I think so. I think they gave me Percocet.
Q That was John Muir?
A Yeah. I don't know if it was John Muir, to be honest.
Q But one of those facilities?
A It might have been the second time I went to see the doctors at Renown. I told them the one they gave me was not working.
Q By the time you got to John Muir had you run out of pain meds?
A I don't know.
Q Do you remember any discussion with them about pain meds changing or anything else?
A No. But they probably did give them to me because, you know, when you go into the emergency room and you have a problem, they usually just give them to you, too, you know.
Q So on 7/8 you went to your primary physician.
Did you see an orthopedic surgeon on 7/8 as

well?
A Not that same date. They sent out a referral, and a couple days later I had an appointment to see him.
Q An orthopedic?
A Yes. It was a couple days. I'm not sure, but I remember going to see one after that.
Q Do you remember whether, when you went to the John Muir facility, they took more X-rays of your ankle?
A I think they did.
Q Do you remember whether, when you went to the Contra Costa facility the first time on 7/8, whether they took more?
A They didn't.
Q Now, do you remember -- this is another memory test here -- do you remember the date of your surgery?
A I don't.
Q All right. The date we have is 7/11.
A Okay.
Q All right. Which would be about three days after your first visit. Okay?
A Okay.
Q Sound about right?
A Yeah, sounds about right.



Q And do you remember the name of the surgeon?
A Dr. James.
Q All right. Jason James?
A Jason James.
Q And prior to the surgery had you met with Dr. James and had him do an evaluation?
A Yes.
Q Did that happen the same day of the surgery or did that happen prior to the surgery?
A That happened -- that was before the surgery.
Q But it wasn't the same day that you went to the primary care for the first time, on 7/8?
A Maybe that was him that I seen on the 8th.
Q I just want your recollection.
A I know I seen him before I had surgery, met him.
Q Did he explain to you what he was going to do?
A Yes.
Q And what did he say he was going to do?
A He was going to put a plate in my ankle and screws to keep it together.
Q As I said, that happened on, according to the medical records we have, on 7/11.
A Uh-huh.



Q Now, I'm going to ask you just a few questions about that.
I understand that during the surgery you were knocked out, you were under general anesthetic; right?
A Yeah.
Q So really dumb question. You don't have any recollection of that?
A No.
Q Here's what we have. We have records that indicate that you arrived at the facility for the surgery at about noon.
Does that sound about right?
A Before noon, actually.
Q And you probably had to do a bunch of check-ins, but on the little form they fill out, it says "Arrived" -- you know, the official time was right about noon, so I'm sure you were there early. Most people go early. And then they also say you were discharged to home at about 8:00 in the evening.
Does that sound about right?
A Yes.
Q Have you ever looked at any of your medical records?
A No.
Q Did Dr. James ever indicate to you how long



the surgery took?
A Took a little while.
Q The records indicate that the surgery -- the surgical time was 38 minutes.
A Uh-huh.
Q Did Dr. James ever talk to you about the actual surgery time?
A No.
Q And the discharge time, according to the records, is actually 7:23 p.m.
Once again, that sounds about right?
A Yes. Discharged from my surgery?
Q Discharged from the hospital.
A Okay. Yeah.
Q How did you get home?
A My father.
Q And was your leg put in a cast after the surgery?
A Yes.
Q Now, the records that we have, the discharge notes that we have and instructions say return for a follow-up in two weeks.
A Yes.
Q Right there, that's all the medical records we have (indicating). We don't have anything after that,

so I just need to ask you some shot-in-the-dark-type questions. Okay?
A Okay.
Q After getting out of the hospital on 7/11 at 7:30 or so in the afternoon, when is the next time you saw a doctor for your ankle?
A Two weeks later.
Q And was that Dr. James?
A Yes.
Q And was it at Contra Costa?
A Yes.
Q And what did Dr. James do for you at that time?
A Took an X-ray.
Q And did he tell you the results of that?
A Yes.
Q What did he say?
A It looked all right, good.
Q And did he take the cast off?
A No.
Q And so the X-ray was taken through the cast?
A Yes. He never put a cast on me.
Q Oh, it wasn't casted?
A Never a cast.
Q What was it?



A Another splint.
Q Another splint, similar to the one you described earlier?
A Yes.
Q To take the X-rays a couple weeks later, did he take the splint off?
A It was, I want to say, like a while after that.
Q Okay.
A Yeah.
Q The surgery was on 7/11. You went back a couple weeks later.
A They didn't take it off then.
Q So when you put your leg up into the X-ray machine, the splint was on it?
A Yes.
Q Got it.
Now, you had surgery. When were the sutures or stitches removed?
A They weren't sutures that need to be removed. They were the kind that dissolve.
Q Once again, I'm shooting in the dark here.
So did they have little -- they call them Steri-strips -- anything like that on the sutures?
A Yes.



Q Or on the --
A Steri-strips. Going across it, yes.
Q But he didn't have to go in and yank out anything?
A No.
Q So they just dissolved, and then the wound healed; correct?
A Yes.
Q So after seeing Dr. James two weeks after the incident or two weeks after the surgery, when was the next time you saw any medical care provider for your ankle?
A Like a month. Two weeks after, two weeks, I think, and that's when they took it off. And that was with the thing on for about a month or maybe even more.
Q Your best recollection is that you went back two weeks later, re-xrayed and all that. You described that for us. And then a couple weeks later you went back to Dr. James again?
A Yes.
Q Once again, if it's just a few days off, it's no big deal.
A Or even a month.
Q But it was at the second follow-up visit that the splint was removed?



A Yes.
Q And was this a splint that you could walk on? Was it a walking splint?
A Yes.
Q So you were able to get around after the surgery walking on the splint?
A Yes.
Q And were you also using crutches or a cane or anything?
A Yeah. Crutches.
Q Single or double crutches?
A Double.
Q After the splint was taken off, when did you next see a doctor?
A A month after that.
Q Dr. James again?
A Yes. Probably my primary care.
Q When the splint was taken off, did Dr. James tell you you could start weight-bearing as tolerated or anything like that?
A Yes.
Q And were you then able to, after the splint was off, put pressure on your ankle and start to walk?
A With pain.
Q I understand, but were you able to do that?

A Yes.
Q Without crutches?
A After he told me to?
Q Yes.
A Yes.
Q Did he ever send you to any physical therapy?
A Yes.
Q And where was the physical therapy?
A I didn't go.
Q Why didn't you go to physical therapy?
A Because I couldn't bring my children and I didn't have a babysitter.
Q When did Dr. James prescribe physical therapy for you, the first postop visit?
A Second.
Q Second postop visit, okay.
And do you remember what the directions for physical therapy were, in other words, how long, how many times a week, those sorts of things?
A No.
Q Bottom line is you didn't go to physical therapy?
A Didn't go.
Q So after the second follow-up visit with Dr. James, did you ever see Dr. James again?



A No.
Q So the medical treatment after that that you received that involved your ankle at all would have been through your primary care physician at Contra Costa?
A Yeah. And, I mean, there wasn't much they can do about it there, you know.
Q What was the name of your primary care physician in Contra Costa?
A It's a whole bunch of different doctors. It's just Contra Costa Medical Clinic -- Contra Costa Clinic -- Medical Clinic.
Q So it's kind of like -- never mind. I was going to give as an obscure reference to Forrest Gump, a movie. You never know who you're going to get?
A You never know who you're going to get. And it's hard to get an appointment with -- you know, there's so many people.
Q When was the last time you saw any medical care provider for your ankle?
A For my ankle, Dr. James.
Q About how long -- you got a scar from your surgery?
A Yeah.
Q About how long is it?
A Want to see it?



Q About how long is it?
A It's like -- I want to say 5 inches, 6 maybe.
Q And I do want to see it.
A Okay.
MR. BURCHAM: We can go off.
(A discussion was held off the record.)
BY MR. BURCHAM:
Q Thank you for doing that. I don't know what that little bony prominence is there on the thing, but it looks like it's a little above the bony prominence on the ankle, and it's, as you say, about 4 inches or so long?
A Uh-huh.
Q Were you given any instructions on creams or anything to put on the scar to make it better?
A No.
Q Did you do anything, like Google that, look it up, to see if there's anything you can do?
A No. I'm not too worried about a scar.
Q How's the ankle doing now?
A As long as it doesn't get cold -- when it gets cold, the pain throbs. When I stand on it too long, there's a pinch. It goes straight up my leg.
Q Does it seem to be getting better over time?
A No. The pain -- of course, the healing of the surgery, you know, it got better, it got better since



then.
Q And Dr. James, I'm assuming, like most doctors, would say, "Hey, if you have problems and need to follow up, feel free to give my office a call and we can take a look at it"?
A He was talking about doing another surgery.
Q When was he talking about that, after the second visit?
A Yes.
Q And what kind of second surgery?
A To fix the pinching. To see if he could do something with the shooting pain.
Q And you haven't followed up on any of that; correct?
A No, not yet.
Q And you haven't had a situation where you've made an appointment and canceled or anything else with Dr. James; correct?
A I did miss one at one point.
Q What I'm saying is, let's say in the last six to eight months, you haven't called him up and said, "Hey, Doc, I've got more problems. Can I come and see you?" You haven't done anything like that?
A No.
Q That's correct?

A Correct.
Q Is there anything you cannot do now that you used to be able to do because of your ankle?
A Yeah.
Q Like what?
A We used to go out, me and my friends, we'd go out dancing, and it's always been something that -- I mean, I used to do Zumba.
Q What's Zumba?
A Zumba is more or less like a Latin dance, like -- for weight loss, and I would use it to keep my weight down, and I can't do that no more.
Q Now, the medical records indicate that at the time of the incident your weight was around 250.
A Yes.
Q Is that about the same now?
A Yes.
Q So you haven't really gone up or down?
A No.
Q Are you a member of any health club?
A No.
Q Have you ever been?
A Yes.
Q And when?
A Before the accident.



Q Was it in Nevada or California?
A California. When I was working at Dyna-Gro, I couldn't -- I couldn't, like, keep up with the rest of the employees there. It was just, like, unbearable to stand up and hold these big boxes, and they let me go. They didn't tell me it was because of that, but I know why they let me go.
Q At the time of the incident your medical records said you were unemployed.
Do you remember going over that?
A Yes.
Q So you weren't working at the time of the incident?
A No. At the time, no, but I had the job with Dyna-Gro.
Q When did you start the job at Dyna-Gro?
A A little before I came to Reno, I was doing little side -- you know, odds and ends here and there for them, and I had pretty much a promising thing. When they picked up work, I was going to start working, like, a full-time position.
Since I got hurt I called them and told them, look, I can't come back and, you know, work like they wanted me to, so I had to wait until I got better. And even while I was healing, they had me doing sitting-down



jobs when I got back.
Q Who was the person at Dyna-Gro you were dealing with?
A Elizabeth Marshall.
Q Did you ever get a paycheck from Dyna-Gro?
A Yes.
Q How many paychecks from Dyna-Gro?
A Three.
Q And they were all after the incident?
A After the incident.
Q So this would have been after your surgery?
A Yes.
Q So it would have been in July, August, September 2014?
A Yes. September. It was more like I started in end of August, I think.
Q When was the last time you saw -- well, I need to know all doctors that you saw after your surgery.
Now, we know you saw Dr. James on two follow-ups. You indicated you saw somebody, a primary care person, at Contra Costa at least once.
A But it wasn't for my leg.
Q I understand.
Who else have you seen doctor-wise, physician-wise, since your accident or -- excuse me --



since your surgery, besides Dr. James?
A Contra Costa Medical Clinic.
Q About how many times have you gone back to Contra Costa Medical Clinic since your surgery?
A A couple times.
Q And they were for non --
A Diabetes.
Q So they were for nonankle-related issues?
A Yeah.
Q You said diabetes?
A Yes.
Q And how about the chronic pain, rheumatoid arthritis, knees?
A Well, yeah. That's part of it, you know.
Q It's just kind of global?
A Yeah. I mean, but it wasn't really -- they didn't ever -- they didn't want to see the scar or anything that had to do with that.
Q Now, I asked you earlier towards the beginning of the deposition whether you were under any medications that might affect your ability to understand the questions, etcetera.
A Yes.
Q Now, I wanted to make sure -- and you said no, but I want to make sure we're talking about not just

prescription medications, but any even nonprescription medications. Is that correct?
A Correct.
Q And when was the last time you took any prescription medication?
A Yesterday.
Q And what was it?
A Norco.
Q So you still have the Norco prescription?
A Yes.
Q And the records that we have before the incident indicate 120 a month.
Does that remain the same?
A Yes.
Q 10 milligrams each?
A Yes.
Q So no change upward or downward?
A No.
Q And what other medication -- you mentioned some other medications for the diabetes.
A Gabapentin.
Q Right. How about the Wellbutrin, are you still taking that?
A Yes. Even more.
Q For the depression issues?



A Yes. Anxiety.
Q When were you diagnosed with depression or anxiety?
A 2011, I think it was.
Q Now, it's my understanding that your visit to the Sun Valley Pool on 6/20 occurred shortly after you had come up here from California; right?
A Yes.
Q And we've got the list of people. There were about eight of them that were in your group?
A Yes.
Q Now, I also asked you about -- the incident happened at about 4:00, you had been there for about an hour and a half, which would have put you at the pool --
A 2:30.
Q -- about 2:30 or so?
A Uh-huh.
Q "Yes"?
A Yes.
Q And had you ever been to the Sun Valley Pool before?
A Yes.
Q Had you been to the Sun Valley -- well, when?
A Around 2008.
Q I understand -- Mr. Busby and I chatted about



this -- on the interrogatory answers it states 2008.
Was that on a single occasion in 2008?
A Correct.
Q So prior to this incident you had been at the Sun Valley Pool a grand total of one other time?
A Correct.
Q And in 2008, when that other visit occurred, who was with you?
A Victor Moreno.
Q And I've got a few pictures here of the slides that are located there, and we'll be going over those, but were the slides there back in 2008?
A Yes.
Q Back in 2008, when you went there with Victor, did you use the slides?
A I did not.
Q Did you see anybody else use the slides?
A I think they were closed because somebody got hurt on them.
Q And do you have any particulars on that?
A Particulars?
Q Yes. You said you think that they were closed because you think somebody got hurt on them.
Do you know anything else other than what you were just telling me?



A I remember asking somebody why were they closed down, and they said somebody got hurt.
Q Do you know who it was that said that?
A Another person swimming.
Q So it wasn't an employee or anything else?
A No.
Q Can you give me a description of the person that said that?
A It was a mother of a child that was there. They were swimming together.
Q Were you told how this person got hurt?
A No, not at all.
Q Do you know whether it was an adult or kid?
A No.
Q So at the time that you went on 6/20/2014, the slides were still there; correct?
A Yeah.
Q And you're telling me that when you got there that day, you saw the slides, and your recollection is the last time you were there they were closed down because somebody had been hurt on them?
A Yeah.
Q We're going ahead a little bit, but you used them that day with that knowledge?
A I mean, I wasn't sure how true the knowledge

77

was, and I seen my friend Cindy go down it, and my sister, so I didn't think nothing much of it.
Q So you don't know one way or the other whether in 2008 somebody had actually gotten hurt on the slides?
A Yeah. I wasn't sure if that was true or not. I was pregnant, too. No interest.
Q All right. So when you got to the pool on day of the incident at about 2:30, did your entire entourage, your entire group, get there at the same time?
A Victor got there later. He came after he got off work.
Q How many vehicles were there total in the group?
A Two.
Q Victor with one and then the other seven people in the other, or how did that work?
A Victor -- Victor got dropped off there. My car and Cindy's car.
Q And what kind of car did you have?
A I have a Dodge Caravan.
Q And you still have that?
A It's not running right now, but I have it.
Q Now, was this kind of a spur-of-the-moment thing that you guys put together, or was going to the

78

pool something that had been planned out ahead of time?
A It had been planned. It had been planned out ahead of time, yes.
Q When you went there in 2008 and comparing that to 2014, did the facility look basically the same or had it changed?
A It looked a little different.
Q Can you describe how it looked different?
A I don't -- I can't exactly describe it. It looked better.
Q When you say "better," what do you mean? Cleaner, that sort of thing?
A Yes. Just cleaner and just -- they had more -- the inside looked better.
Q When you went out to the pool in 2008, was there, like, a sign-in area?
A No. Just go and pay and walk in.
Q Do you remember how much it cost back in '08?
A (Witness shakes head.)
Q In 2014, when you got out there, was there a sign-in area or do you just pay?
A You just pay.
Q And on this particular day when your group got there at about 2:30, do you remember what the cost was for adults, children, that sort of thing?

79

A I think we did, like, a group thing.
Q Do you remember how much?
A Huh-uh.
Q Like 50 bucks, 20 bucks, 10 bucks, 5 bucks?
A I want to say maybe like 15, 20 bucks, maybe.
Q For your entire group?
A For the people in my group, my sister, my kids, me.
Q Have you ever gone to Wild Waters, the water park?
A Yes.
Q About how many times?
A Two.
Q Before this incident?
A Yes.
Q Now, they have a lot of the different water slides and attractions at Wild Waters; right?
A Yes.
Q When you went there on those two occasions, did you ever use any of the slides at Wild Waters?
A Yes.
Q Do you remember the name of any one that you used?
A No.
Q There's some out there that are corkscrews.

80

Do you remember that?
A Yes.
Q Did you use that one?
A Yeah.
Q And no problems?
A No.
Q And there's one called like the Black Widow.
A No.
Q You didn't go on that one?
A No.
Q Do you remember the name of any of the others when you went out there or that you used while at Wild Waters?
A No.
Q Had you had anything to drink, alcoholic-wise, prior to to or on the day of this incident?
A No.
Q How about anybody else in your group?
A No.
Q Had you -- I'm going to ask you this, I apologize -- taken any Norco that day?
A No.
Q But you had the previous day?
A Yes.

Q And any other drugs, licit or illicit?
A No.
Q Do you have a marijuana license in California?
A No.
Q So when your group got there on 6/20, did you bring in, like, drinks, refreshments, food, or anything like that?
A No.
Q So no cooler with you or anything?
A No.
Q Do they have a snack bar there?
A No.
Q I don't know what their policies were at the time, but do you know whether they had a policy of outside beverages coming in being okay and that sort of thing?
A I didn't even check.
Q If you get thirsty, you go over to a drinking fountain?
A Yeah.
Q Did they have, like, soda machines or anything like that?
A No.
Q When you went in on this particular day, what



kind of -- I don't know what you call them -- swimming items did you bring? What I'm getting at, flotation devices for the kids, anything like that.
A No. We just brought in our towels and our --
Q So all of the kids were water safe?
A They were in the baby pool.
Q I didn't write it down. Andru, Cynthia's kid, was how old?
A Four.
Q So you had two kids and Cynthia had one, Andru?
A Yes.
Q And those kids were in the baby pool?
A Yes.
Q Did they ever venture over into the big boy pool?
A No. My son did, my stepson, Victor's son.
Q That's Victor's son, who was ten?
A Yes.
Q Now, as I said -- and I think this is probably about the best one that shows the apparatus, so we'll mark it.
(Exhibit 1 was marked.)
/////



BY MR. BURCHAM:
Q So I've marked as Exhibit 1 to this deposition a photograph of the pool or of the slide apparatus at the Sun Valley Pool.
Does that look familiar to you?
A Yes, it does.
Q So we have kind of, for lack of a better term, a tower in the middle, and I'm color-blind, but a couple or three different colored tube slides coming out of that tower; right?
A Yes.
Q And the middle one, what color is that?
A Yellow.
Q Did this incident happen when you were using the yellow one?
A No.
Q And if you look at that photograph, I think it's a blue one on the left of the photo.
A Yes.
Q And then there's another one on the right that looks kind of similar?
A Yes.
Q Was it the left or the right one where this incident happened?
A It was the right one. I know it was blue.



Q All right. Are both of those blue in the picture?
A Yes.
Q Now, one of them, if you look at some other photographs, the side of it says "The Blue Team Tube," and then another one says "Lifestyle Homes" something. Okay?
A Yes.
Q So between those two, which one --
A It was the top one.
Q The Blue Team tube?
A Yes. Yeah.
Q So that would have been, I think, if we're looking at the two tubes there, Exhibit 1, it would be the tube slide to the left?
A Okay.
Q Does that sound right?
A That's it, yeah.
Q Now, let me have the picture back.
When you got to the pool on this particular day and you were setting up and maybe putting towels out or whatever, there were other patrons there; right?
A Yes.
Q Was 6/20/2014 a particularly unusually hot day?

A It was hot, yes.
Q And this was in the middle of the afternoon; right?
A Uh-huh. Yes.
Q So your group wasn't the only group there; it was fairly crowded?
A Crowded.
Q Lots of kids running around and play going on and everything else?
A Yes.
Q When you got there people were using the slides; right?
A Yes.
Q People in other groups; right?
A Yes.
Q While you were there before your incident, did you see anybody else have any problems with any of the slides?
A No.
Q Now, did you see both kids and adults using the slides?
A Yes.
Q It was predominantly used by kids, most of the -- or was it --
A There were more kids there than adults, so



there were more kids using the slides than adults.
Q When you got there and before using the slides, do you remember seeing any rules or regulations about using the water slides?
A No.
Q So showing you, without marking it, a -- it's called Water Slide Rules -- and it's kind of hard to read because of the shadow -- do you see that?
A Yeah.
Q You didn't read any of that before you used the water slide?
A I don't believe so.
Q The way the water slide works is there's a tower, and then there's a staircase that kind of goes up to the different levels?
A Yes.
Q And then there's an entrance into the slide, and then there's the slide itself?
A Yes.
Q Is there water going down the slide to keep it slippery?
A Yes.
Q How many times had you used the slide this day before your incident happened?
A That exact slide?



Q Any of the slides.
A I had used the other slide one time.
Q Which other slide, the yellow one or the other blue one?
A The other blue one.
Q How about anybody else in your group? Had they used the slides, any of the slides before your incident?
A Cindy and my sister had been using it already for a while. I think they went down about two times each. My son, about three.
Q Your son? Which son?
A I raised him so I feel like he's my son. That's Victor Moreno's son.
Q Had any of them had any problems?
A They didn't. He told me after --
Q Who's "he"?
A My son, Victor Moreno. He said that he hit his butt on the bottom of the pool when he went down that slide.
Q On that day?
A Yes.
Q So he said that afterwards, but he didn't say it at the time?
A No, he didn't say it at the time.



Q And that didn't hurt him?
A He didn't say it hurt him, but he said he wasn't expecting it.
Q So you got up on the platform initially and used the other blue slide, which was the Lifestyle Homes slide?
A Yes.
Q And that discharged out into the water, and you didn't have any problems?
A No, no problems.
Q Did you ever use the middle slide?
A No.
Q All right. So you got there at about 2:30-ish, the incident happened about 4:00, so you had been there an hour and a half or so before the incident happened; right?
A Yes.
Q And during that period of time, other than riding the other blue slide once without problems, what had you been just generally doing?
A Playing with my kids in the baby pool.
Q Had you been using the big pool as well at all?
A When I went down the first slide, I went into the pool and then swam back out.

Q What I'm getting at, had you done any laps or anything like that?
A No.
Q Had you gone to Victor, the 10-year-old Victor, and splashed him, played around in the big pool at all?
A He was already in there when I was coming back, you know, and I sat and talked to him and, you know, then got out.
Q All right. So you went down the other blue slide once. Then after swimming and getting over the edge and getting out, what happened after that?
A I went to my baby -- the baby pool where Victor was with the kids, and I asked him if he wanted to go down the slide with me, that it was really fun.
Q And he said, "Sure"?
A And then he said, "Sure."
And then I think the kids got out of the pool, and I went back in line to get down -- to go down the next slide. And there was a lifeguard sitting there, and I asked him, I said, "Which one do you like the best?"
And then he said he likes the big, tall blue one that is the fastest, and he recommended I should go down that one, that I should try that one. And I tried



that one, and when I hit the water and I got in the water, I just remember hearing --
Q Okay. We'll get there.
So you asked this lifeguard. Now, where was the lifeguard -- if we look at Exhibit 1, where would he have been located?
A Okay. The pool comes this way, and he sits right here (indicating) before people walk by to get on the slide.
Q So if you're looking at that photograph, Exhibit 1, it would be on the left -- if we continued the photograph down, it would be the left lower side?
A Yes. The corner.
Q And I'm just curious. You've seen the tube type of slides that aren't water slides but are at parks and things like that, haven't you?
A Yes.
Q And I have five kids, so I've been to parks.
And so you've seen nonwater-slide slides in parks that just kind of discharge people maybe into sand or that bark-type substance; correct?
A Yes.
Q Have your kids ever used those types of slides?
A Yeah.



Q Have they ever been hurt on those types of slides?
A Never.
Q Did you ever go down those slides with them?
A Yes.
Q Never hurt yourself?
A Never.
Q Do you remember seeing any of the little depth numbers anywhere on this pool that are sometimes put on the side of the pool, like 6 feet, 4 feet, 2 feet, 8 feet?
A Yeah.
Q What numbers do you remember?
A I don't remember the numbers.
Q Do you --
A I think 6 maybe.
Q Do you have any personal knowledge of how deep the water is in the discharge area of the pool?
A I personally don't remember.
Q So you asked the lifeguard, and the lifeguard told you -- describe this lifeguard for me.
A He was Caucasian, and he had blondish, kind of sandy hair, kind of looked like a surfer guy.
Q Any age that you --
A Maybe 19, 20.



Q Did you ever catch the name of that person?
A No, I didn't.
Q So if I threw out a bunch of hypothetical names --
A I would not know. I never asked him his name.
Q So going to the blue one that you ended up going on, did you then head up the stairs and go to the blue one?
A Yes.
Q Was that with Victor?
A By myself. It's one person at a time.
Q Was there a line that you had to wait for?
A Yes.
Q Where's the line formed?
A Right where -- the lifeguard is the one who controls that line and the slides.
Q So if you're going to use any one of these three slides, you have to go to a line somewhere near this lifeguard you described?
A Yes.
Q And then one at a time he lets you through?
A Yes.
Q And is that what you had witnessed occurring prior, while you had been there for an hour and a half?

A Yes.
Q How long was this line?
A About five people.
Q So it wasn't like a 10-minute wait?
A No. No.
Q Not like Disneyland and trying to get on one of those rides?
A No.
Q And then when you got up there, it's not like you were climbing over other people; you were all alone at the top of the slide; right?
A Yes.
Q And then you got into the slide. Any problem getting in the slide?
A No.
Q And you were wearing a bathing suit of some sort?
A Yeah.
Q Just a typical --
A Shorts and like the -- yeah. It's like shorts and a T-shirt -- the spaghetti strap thing, type thing.
Q And you got in, and describe for me the ride.
A Well, I went down, and it was great, but I remember hitting the water, and then the next thing I



heard was a crack. And I remember I'm almost, like, blacking out right when I got up to the thing, and the lifeguard looked at me, and Victor looked at me, and he said, "Are you okay?"
And I said, "No."
And the lifeguard is like, "What's the matter? Do you need help?"
And I said, "Yes. I'm not okay. I'm not okay."
And so I got my way to the stairs, and I was bleeding, and my leg was like -- I felt it crack as soon as I put pressure on it.
Q Which stairs did you get to?
A All the way at the base of the pool, that lower --
Q Is it in the photograph, Exhibit 1?
A No, it's not in the photograph. It's all the way on the other side of the pool.
Q Now, this pool is generally a rectangular shape?
A Yes. The shallow end is where the stairs and the --
Q All right. And I'm just going to kind of use it as a -- I don't know -- a prop here, the photograph, Exhibit 1.



Imagine, instead of the photograph, it's the pool.
A Yes.
Q So generally it's a rectangular pool; right?
A Uh-huh.
Q That's a "yes"?
A Yes.
Q But the water slides are located at one end of the pool; correct?
A Correct.
Q And they discharge you into the pool, and then where you got out of the pool was on the opposite side, opposite end?
A Say this is the pool (indicating).
Q Use -- so I can visualize, can you use that to visualize?
A Yeah. So the pool comes down here (indicating). Okay? And this is -- I came out of the water here, and then I swam -- yeah -- got my way to where the stairs are at the entrance of the shallow end of the pool.
Q So on the opposite end?
A Opposite end.
Q Opposite end of where the slides are?
A Yeah. I couldn't -- I could not get out of



the water on something like that.
Q Okay. Got it.
So whatever distance that was, did you swim or dog paddle or --
A I managed. It was horrible.
Q When you heard the crunch and felt that and surfaced, you were fairly near where the lifeguard stand was?
A I was towards the middle of the pool.
Q Were you able to stand up there?
A No.
Q When I say, "able to stand up," it was too deep?
A Too deep.
Q So you went back to the shallow end?
A Yes.
Q And when you got out of the shallow end, there's little stairs that go up?
A Yes.
Q And you weren't able to walk up those stairs because of your ankle?
A Yes. I tried, and it was very painful.
MR. BURCHAM: It's been a little over an hour. We're going to take another little five-minute break or so, and then we'll come back and finish.

BY MR. BURCHAM:
Q We're back on the record.
A little bit just about you going down the tube slide.
You went feet first; correct?
A Yes.
Q And how did you have your hands? Did you have them just kind of laying out or did you put them over your chest?
A Yeah. I just have a natural way of always just kind of going like this (indicating). I went like that.
Q And that's the way you did it earlier on the other blue slide; correct?
A Yes.
Q And when you've used water slides before, that's the way you've positioned yourself?
A Yes.
Q And so feet first, head back, head along the back, or did you raise your neck up any at all?
A Not that I can recall.
Q When you hit the water do you remember -- I like to go up to mountain lakes and throw rocks across them and skip them.
Do you remember whether you had kind of a



skipping feeling as you hit the water? Did you just kind of sink?
A I just went down, just went straight. You know, at first I was at the top, and then (audible noise).
Q Was there anything out of the ordinary at all on the way down the water slide that caused you to go, huh, this is different than it's been in the past?
A It was pretty fast.
Q You've been down fast water slides before?
A Yes. There was nothing wrong with the slide that -- you know.
Q Then after you got to the edge, how did you get out of the pool?
A Victor came, and he pretty much took the weight from my right side and helped me out of the stairs. And I was holding onto the rail, and we got out -- I got out. I had to step down on my foot, I remember, or something, and that's when I felt another crunch.
Q And when you got out of the pool -- well, strike that.
Using Exhibit 1, did your group have all of your towels and stuff located in one particular area?
A Yes.



Q And can you, using that picture, kind of tell me --
A Right here is the baby pool (indicating).
Q So the baby pool is off to the left of Exhibit 1?
A My left, yes. And there's something separating them, and our stuff was in the corner by the baby pool.
Q So it's not too far from where that lifeguard was that had the line for the water slides?
A Yeah.
Q And so, anyway, after you got out of the pool, Victor helped you out of the pool, did you go back over to where the towels and stuff were?
A No. No. They had a gurney waiting for me right there.
Q So how long was it after -- how long did you remain in the pool after the incident?
A I could not stand up and move. I was in, like, a shock. I want to say it was about a few minutes, not long.
Q But you did get out of the pool --
A I did.
Q -- and you've previously indicated that it might have been 20 minutes or so for the paramedics to



get there with the gurney?
A I think they had like -- something like a gurney there.
Q Oh, they did. Okay.
So the gurney that you're talking about isn't a gurney that the paramedics brought in; it was an on-site gurney?
A Yes, it was an on-site thing.
Q Part of their basic safety equipment?
A Yes.
Q So somebody brought that out for you?
A Yes.
Q Do you remember who that was?
A Another guy.
Q Another guy?
A I think he was, like, the one in charge.
Q Can you describe that other guy?
A He kind of looked like the first one. He was also a Caucasian male. He was maybe a little bit older.
He just pretty much sat it there, and I think he did actually -- maybe he might have brought out ice. And I'm not sure if they did any type of first aid, but I was bleeding.
Q Where were you bleeding?
A My foot was all open, scraped.

Q So what part of your foot?
A My toe -- from my big toe to the ball, it was all skinned.
Q And that was on your right foot?
A Yeah.
Q And so there was an open abrasion that was bleeding?
A Yes.
Q And it had been bleeding while you were in the pool?
A Yes.
Q Did they close down the pool?
A No.
Q At some point in time that day, did anyone, either while you were at the pool or later on with the paramedics or later on at Renown, put any dressings on any open cuts or abrasions?
A They did.
Q Who did?
A Renown. They cleaned it up also in the ambulance.
Q Okay. And so when you were discharged that day from Renown, you had that splint that you've described, and you also had some dressings on your foot?
A Yes.



Q During the 20 minutes or so between the incident and the paramedics getting there, did you talk to any of the personnel at the pool? You had that one guy you said looked like the first guy except a bit older.
A Yes. He came -- I want to say it was him, but I'm telling you it was almost like a blackout. Like I could hear things and I think it was him.
He said -- there was a kid sitting down by where I was getting out of the pool, and he said, "Oh, no, they're going to shut the slides down again."
Q So some kid? Not an employee, some kid --
A Not an employee said that. And then -- and then I just like -- and I remember I was crying, and then the lifeguard said, "Don't feel bad. This has happened before."
Q Now, who said that?
A I'm almost positive it was the same lifeguard that -- I don't think it was the same lifeguard that was sitting at the corner of the pool. I think it was another one.
There was people kind of crowded around me, and I was just trying to focus on staying -- I kind of felt like I was going to faint.
Q And then what are those words that you



mentioned again that might have been from this first lifeguard guy?
A It probably wasn't from him, but it was a lifeguard who said it. He said, "Don't feel bad. This has happened before."
Q Is that all you heard regarding that?
A Yes.
Q And can you describe that person?
A No. That's the person that I can't exactly describe.
Q Are those words, "Don't feel bad, this has happened before," the exact words or, rather, your interpretation of the words?
A Probably my interpretation of it.
Q And you can't describe height, weight, nationality or --
A He was white as well.
Q Other than nationality, height, weight, or anything else like that?
A White, Caucasian, thin.
Q Age?
A Probably about 20 -- 20 something, 22, 23.
Q Did anybody else say anything along those lines to you?
A No.



Q Did you respond in any way to that question or that comment?
A No.
Q Did you have any other interaction with anybody that you think might have been associated with the pool on this day after the incident?
A Not at all.
Q How about subsequent to then, between now and then?
A No.
Q Have you ever been back to that pool?
A No.
Q Have you ever been back to any pool since then?
A No. My -- we have a little pool in the backyard that's just like the little ones, you know. Not too little, but --
Q Is it a pool that requires a filtration system?
A Yeah.
Q Okay. So it's an above-ground?
A Yeah.
Q It's not one of those little kiddie pools that you just fill up with a hose?
A No.

Q So it's a little more sophisticated than that?
A A little bit.
Q So you've been in that?
A Yeah.
Q Some of those I've seen actually have slides attached to them. Do you have a slide attached to that one?
A No.
Q Have you ever used one of those above-ground pools that has a slide attached to it?
A Yes.
Q Without a problem?
A Without a problem.
Q Did you use that pool, above-ground pool, with the slide attached to it when you were an adult or just when you were a kid?
A I want to say I was about 25.
Q That would put you as an adult.
A Yeah.
Q So, in other words, a few years ago?
A 22 maybe. 22, 25, somewhere around there. I was younger.
Q Can you think of anything coming down that slide that occurred which caused you to hit the bottom?



A No. And you said, did I look down? I probably did look down. Did I lift up my neck? I probably did.
Q But just as you're sitting here today -- I'm sure you've mulled this over over the last year, like, gee, what happened?
A Yes. I've been down water slides. I love water slides. Not anymore.
Q And you can't think of anything that was out of the ordinary on this particular one?
A Nothing.
Q Do you know whether any members of your group used the water slide after your incident?
A No. We all left.
Q Did you all leave at about the same time when the -- when you were taken away with the ambulance?
A Yes.
Q Do you know whether Victor had used the Sun Valley Pool on any prior occasions other than that time in 2008 and this time?
A No.
Q You don't know one way or the other?
A No, he never has.
Q Was the place that you were staying at the time of this incident the C Street or --



A It was Merchant where I came to visit. When I came down to visit, it was at his house on Merchant.
Q And how was it that you guys picked the Sun Valley Pool as a place to go?
A Because they had slides.
Q As I mentioned, the court reporter is going to prepare a transcript. You'll have the opportunity to review it and sign it, okay. And I just want to emphasize that things can be changed, you can change some of your answers, but if it is an important, material change, then I could comment on it.
And I'll just describe a little bit more what an important, material change would be. Okay?
When you're reading a transcript, it will be in a little booklet form, and I would estimate it will have about 80 pages or so in it based upon the amount of time that we've been going here, maybe a little bit longer.
Let's say that, hypothetically, this case involved a dispute of whether a stoplight was red or green at the time of an auto accident, and you under oath today said the light was red, and then later on you looked at your testimony and you scratched out the word "red" and you put in "green." It changes things. It's kind of like a 180-degree change.



A Yes.
Q Those types of important changes, if you do make them, could affect your credibility because I can comment on it. Okay?
A Okay.
MR. BURCHAM: With that, Luke, I don't have anything else. Do you have anything?
MR. BUSBY: I have a few follow-up questions.
MR. BURCHAM: Sure. Go ahead.

EXAMINATION
BY MR. BUSBY:
Q I'm just going to ask you a few questions about some of your answers and some of the questions that Mr. Burcham asked you. Okay?
A Okay.
Q Mr. Burcham asked you a few questions about what was going on at Dyna-Gro around the time of the accident.
A Yes.
Q Can you clarify what your employment status was with Dyna-Gro at that time?
A At the time I was more of an on-call. I was helping them catch up. They had told me when things picked up that they were going to let me know so I can

start my employment there.
Q Was it your understanding that you were about to have a full-time regular job at that point?
A Yes, it was.
Q And is that the basis for your claiming lost wages in this case?
A Yes.
Q Okay. So it was your expectation at that time that you would be working?
MR. BURCHAM: I'm just going to object on leading grounds, but go ahead. Form.
BY MR. BUSBY:
Q Go ahead. Was it your expectation --
A Yeah. I expected to be working there full-time.
Q Do you know who saw you immediately after you hit your foot on the bottom of the pool?
A Victor and Cindy were standing in line because, you know, you have to wait. One person goes down, and when they come up and get out of the way, then another person comes down. We were standing next to a lifeguard, so it would be Cindy, Victor, and the lifeguard.
Q Did Sophia see you?
A Sophia, yes. Sophia was there.



Q So she was in the vicinity?
A In my group, yeah. No. Sophia was in the pool, like where the line is, because she went before me. So she had crossed the line, and she was waiting for me right there.
Q Mr. Burcham asked you some questions about John Muir and Contra Costa.
Do you recall how you got to Contra Costa from John Muir?
A My father.
Q But were you referred to Contra Costa by a doctor at John Muir?
A When I seen the doctor at John Muir, he said, "This needs surgery. You need to see a surgeon ASAP."
Q And that's how you got to Contra Costa?
A That's how I went from -- yeah.
Q Mr. Burcham asked you some questions about your discussion with the lifeguard before you went down the Blue Team tube slide.
You mentioned that the lifeguard recommended that you go down the big slide?
A Yes.
Q Do you remember exactly what he said?
A He said -- I asked him which slide was -- which one should I try, which one did he like the



most. And he said, "I like the blue one." He said, "It's -- to me, it's the best." He said, "You should definitely try it."
Q Were you given any indication that the slides were for children?
A Never. It -- everybody in my group, except for Victor, had went down, and they were adults. I mean, except Sophia is 16, but she's still my size, and there were a lot of parents going with their children down the slide.
Q I want you to take a look at what's been marked as Exhibit 1. Mr. Burcham showed you this -- showed you this photograph.
In the bottom left of the picture there's a number indicated there.
A Uh-huh.
Q Can you read what that number says?
A 3-1/2.
Q What do you think that number indicates?
A I know that's not how deep it is there.
Q How do you know that?
A 3-1/2 feet right there? No, that's not 3-1/2 feet right there.
Q But is that what that sign is intended to indicate?



A That is what it says.
Q In response to a question from Mr. Burcham about what the lifeguard said after you hit your foot on the bottom of the pool, you stated that he said, "Don't feel bad. This has happened before."
A Yes.
Q Or equivalent words; is that correct?
A Yes.
Q You don't recall exactly what he said?
A Probably not word for word, but --
Q Has anyone else mentioned to you that other people have been hurt at the pool?
A Yes. Since I have been hurt and I've told friends -- I think I actually posted it on my Facebook page that -- you know, "Sorry for not responding to your guys' calls. I've been hurt," you know, water slide, you know. And they said -- and then from there I got people telling me that there have been a lot of people who have been hurt at that park -- pool.
Q Did people tell you --
A A lot of people have been hurt at that pool in the past. I don't know how true that is.
Q Do you still have access to your Facebook account?
A I do -- I don't have the same account since

that time.
Q Okay. You have a different account now?
A Yeah. I don't have that, but, I mean -- and people were telling me they didn't write it on my page. You know, they just told me.
Q So you didn't have conversations about other people getting hurt on the slide?
A On Facebook. It wasn't on Facebook.
Q It wasn't on Facebook, okay.
When was the last time you talked to Cindy Sanchez?
A I want to say December or -- like, I mean -- when was I here last time? I would say maybe February.
Q And you and Cindy are friends?
A Well, I mean, she's friends with Daisy.
Q Can you explain who Daisy is?
A Daisy is my best -- was my best friend, but she and Victor are together now, my husband and my best friend. So Cynthia is -- she was the one who introduced me and Daisy about 15, 16 years ago, so she feels like -- she doesn't want to be in the middle of me and her since Daisy was my best friend and my husband left me and my kids for Daisy, so she feels like she doesn't want to be really involved.



Q So there's a love triangle going on here, and Cynthia is friends with the other women?
A She was friends with us both, but I guess she said she doesn't want to be part of none of our lives because it's just all fucked up. Sorry, but it is.
MR. BUSBY: Okay. Okay. No further questions. Thank you.
MR. BURCHAM: Just a couple follow-up.

FURTHER EXAMINATION
BY MR. BURCHAM:
Q Were you married to the baby daddy?
A Yes.
Q And are you now divorced?
A We're processing that right now.
Q Where is that being processed?
A I just got the paperwork, and I filled it all out. Haven't processed it completely yet, but it's going to be processed in California.
Q Do you have a lawyer that you're going to be using for that?
A No.
Q Now, you said a lot of people have been hurt, some people told you that or whatever, and you said, "I don't know whether that's true or not."



Who can you identify by name that said that to you?
A My mom's friend that lives right next to the pool.
Q Who is that, please?
A Her name is Lauralee.
Q What's LauraLee last name?
A I don't know.
Q Anybody else?
A No.
Q So one person is Lauralee?
A Well, her son. I mean, her son, he told me his friends have told him, too. It was just like a --
Q What's the son's name?
A His name is Lee.
Q Lee?
A Yeah.
Q Anybody else?
A No. It's kind of like hearsay.
Q Right, it is.
So you got Lauralee and Lee. How old is Lee?
A He is 24.
Q And they live out there in Sun Valley somewhere?
A Yes.



Q What's their address?
A I have no clue.
Q What's Lauralee's last name? I might have asked you that.
A I don't know.
Q No clue. Or Lee's last name?
A I don't know.
Q When was the last time you talked to Lauralee?
A I don't talk to her. My mom has.
Q So this is --
A I want to say like a year ago.
Q Have you ever spoken to Lauralee?
A I have spoken to her before, but it has been past. My mom is the one that talks to her and hasn't talked to her probably for like a year.
Q What I'm getting at, do you talk to Lauralee directly or is this what your mom told you Lauralee had told her?
A That's what my mom said Lauralee and her son told her.
Q Got it.
A I could probably get ahold of them if you need.
Q Pardon me?

117

A I probably could get ahold of them if you need them.
Q It will be here somewhere in my notes that I remember writing down --
Oh, Stella, that's your mom?
A That's my mom.
Q She's the one that lives over on C Street?
A Yes.
Q And does Stella work?
A She cleans houses, so -- I don't know the company she's with, but housecleaner.
Q And what's her age?
A I think she's 52.
Q Is she single or married now?
A Widowed.
Q Who else lives with Stella?
A Sophia.
Q Anybody else?
A No.
MR. BURCHAM: Thanks.
(The deposition concluded at 11:57 a.m.)

118

-oOo-

CERTIFICATE OF WITNESS

I hereby certify under penalty of perjury that I have read the foregoing deposition, made the changes and corrections that I deem necessary, and approve the same as now true and correct.

Dated this ____ day of ___________________, 20___.

_______________________________

Stephanie Ridgway

119

CHANGES OR CORRECTIONS BY WITNESS

PAGE LINE

____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________

120

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, PEGGY B. HOOGS, a Certified Court Reporter in and for the County of Washoe, State of Nevada, do hereby certify that on Wednesday, July 22, 2015, at the offices of Thorndal, Armstrong, Delk, Balkenbush & Eisinger, 6590 South McCarran Boulevard, Suite B, Reno, Nevada, I reported the deposition of STEPHANIE RIDGWAY in the matter entitled herein; that said witness was duly sworn by me; that, before the proceedings' completion, the reading and signing of the deposition were requested by counsel for the respective parties; that the foregoing transcript, consisting of pages 1 through 118, is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter to the best of my knowledge, skill and ability.

I further certify that I am not an attorney or counsel for any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

Dated at Reno, Nevada, this 6th day of August, 2015.

_______________________________

Peggy B. Hoogs, CCR #160, RDR

WITNESS'S ACTIONS RE: SIGNING OF DEPOSITION

DATE
8-6-15 AT DIRECTION OF COUNSEL, TRANSCRIPT WAS SENT ELECTRONICALLY TO LUKE BUSBY FOR WITNESS TO REVIEW

WITNESS SIGNED DEPO

ORIGINAL SENT TO

OTHER ACTIONS